UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MARSHALL L., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-00128 |
| | ) | |
| NANCY BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND DENYING THE COMMISSIONER'S CROSS-
MOTION FOR JUDGMENT ON THE PLEADINGS**
(Docs. 8 & 9)

Plaintiff Marshall L. is a claimant for Supplemental Security Income ("SSI")

benefits under the Social Security Act. He brings this action pursuant to 42 U.S.C.

§ 405(g) to challenge the decision of the Social Security Commissioner (the

"Commissioner") that he was not disabled at any time after filing his application for SSI

benefits.[1] Pending before the court are Plaintiff's motion for judgment on the pleadings

and the Commissioner's cross-motion for a judgment on the pleadings affirming her

decision. The court took the pending motions under advisement on December 27, 2017.

After his SSI application was initially denied by the Social Security

Administration ("SSA"), Administrative Law Judge ("ALJ") Stephen Cordovani found

Plaintiff ineligible for benefits based on a conclusion that he retains the residual

functional capacity ("RFC") to perform jobs which exist in sufficient numbers within the

---

[1] Disability is defined as the inability "to engage in any substantial gainful activity by reason of
any medically determinable physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a continuous period of not less than 12
months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or mental
impairment or impairments" must be "of such severity" that the claimant is not only unable to do
any previous work but cannot, considering the claimant's age, education, and work experience,
engage in any other kind of substantial gainful work which exists in the national economy. 42
U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

national economy. Plaintiff identifies the following error in the Commissioner's decision: the ALJ improperly "cherry picked" certain conclusions from a psychological consultative opinion to which he afforded great weight, but failed to include other conclusions from the same opinion without explanation or justification. As this opinion contributed to the ALJ's mental RFC determination, Plaintiff contends a remand is necessary. The Commissioner opposes that result and contends the ALJ properly evaluated the evidence and complied with legal standards.

Melissa Pezzino, Esq. represents Plaintiff. Special Assistant United States Attorney Oona Marie Peterson represents the Commissioner.

## I.    Procedural History.

Plaintiff filed a protective application for SSI benefits on May 3, 2013 alleging a disability onset date of February 28, 2013.[2] His application was denied initially on August 9, 2013, prompting Plaintiff to request a hearing before an ALJ on September 24, 2013. ALJ Stephen Cordovani presided over the hearing on June 22, 2015 in Buffalo, New York. Plaintiff appeared with his attorney and testified, as did Vocational Expert ("VE") Josiah Pearson. On August 19, 2015, ALJ Cordovani issued a written decision finding Plaintiff not disabled within the meaning of the Social Security Act at any time after he filed his SSI application.

Thereafter, on October 7, 2015, Plaintiff sought review of ALJ Cordovani's decision with the SSA's Office of Disability Adjudication and Review Appeals Council ("Appeals Council"), which denied his request on December 13, 2016. ALJ Cordovani's August 19, 2015 determination therefore stands as the Commissioner's final decision.

## II.    Factual Background.

Plaintiff was born in 1981 and was approximately two weeks from his thirty-second birthday when he filed his SSI application. After repeating some levels of

---

[2] ALJ Cordovani's decision consistently states that Plaintiff filed his application on April 9, 2013. However, there are only two applications in the record, one from September 7, 2011 that is not at issue in this case, and one from May 3, 2013. The court assumes that the ALJ's reference to April 9, 2013 is a typographical error, which is harmless because the ALJ considered "the complete medical history." (AR at 8.)

primary and secondary education, he completed the ninth grade before leaving school. At that time, Plaintiff's school records indicated that he had reached a grade level equivalency of 7.1 for reading and 6.9 for math and was classified as learning disabled. Plaintiff subsequently enrolled in special education courses in an effort to obtain his general equivalency degree but did not complete the curriculum. He briefly held jobs as a short-order cook and laborer, but his earnings history is insufficient to qualify those jobs as previous gainful employment under SSA regulations.

Plaintiff's initial application for benefits alleged disability on the basis of depression, anxiety, and bipolar disorder, which the ALJ deemed severe. His medical record, however, also reveals a history of cervical and lumbar spine disorders, loss of visual efficiency in his right eye, and asthma, all of which the ALJ considered in his written decision and also deemed severe. Consequently, the ALJ included both mental and physical functional limitations in Plaintiff's RFC.

In his motion seeking reversal of the Commissioner's decision, Plaintiff does not contest the ALJ's RFC determination with respect to his physical limitations. Instead, he confines his challenge to the ALJ's determination of his mental RFC and alleges that the ALJ failed to include certain non-exertional limitations noted in a consulting opinion to which the ALJ accorded great weight. Accordingly, the court focuses primarily on that aspect of the record in its review.[3]

### A.   Medical History.

On January 26, 2012, Sandra Jensen, Ph.D. performed a psychological consultative examination of Plaintiff in connection with an earlier application for SSI benefits. At this examination, Plaintiff stated that he was "unable to work now because he has 'authority issues and doesn't like to be around people.'" (AR at 236.) Plaintiff described a troubled childhood, including removal from his family home and repeated

---

[3] The Commissioner has also taken this approach, observing that "Plaintiff's arguments address only the ALJ's evaluation of his mental impairments. Thus, the Commissioner limited the facts and arguments in her brief solely to Plaintiff's mental impairments." (Doc. 9-1 at 17 n.5) (citation omitted).

absences from school. He related that he spent time in a juvenile detention center in Buffalo and then a group home in Niagara Falls, eventually returning home and "quit[ting] school, which was around the ninth grade." *Id.* Plaintiff noted a history of periodic counseling but no psychiatric hospitalizations. He reported difficulty sleeping even with the aid of Ambien. He also suffered from a loss of appetite. Plaintiff's wife stated that he was often anxious, irritable, and moody. Plaintiff or his wife (the record is unclear as to which) further informed Dr. Jensen of "occasional auditory and visual hallucinations" and memory challenges. (AR at 237.) Plaintiff was able to perform all of his activities of daily living ("ADLs") as necessary, but did not manage money well and disliked shopping "because he does not like to leave his home." (AR at 239.)

Dr. Jensen described Plaintiff's "demeanor and responsiveness to questions" as "cooperative, but a bit irritable." (AR at 237.) In general, his social interaction skills were "adequate." *Id.* Dr. Jensen noted Plaintiff's appearance and grooming were appropriate and that his gait, posture, and motor behavior were normal. Plaintiff's speech was normal in rate and volume with adequate expressive and receptive language. His thought processes were coherent and goal directed with no evidence of hallucinations, delusions, or paranoia during the evaluation. Dr. Jensen found Plaintiff's attention and concentration intact and noted that he was able to do "simple calculations and 5 out of 6 serial 3s subtractions from 20." (AR at 238.) Similarly, Plaintiff's recent and remote memory were intact, with the ability to name three objects within three and five minutes of viewing them. Dr. Jensen found Plaintiff's intellectual functioning to be "probably in the average range" but noted that he exhibited poor insight and judgment. *Id.* Dr. Jensen's assessment was that Plaintiff could:

> follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new simple tasks, and perform complex tasks with supervision within normal time limits. His ability to make appropriate decisions, relate adequately with others, and appropriately deal with stress would be mildly to moderately impaired due to mood disorder and suspected personality disorder.

(AR at 239.) Dr. Jensen diagnosed Plaintiff with bipolar disorder and antisocial personality disorder.

On February 6, 2012, Daniel Mangold, M.D. completed a Psychiatric Review Technique ("PRT") form in connection with Plaintiff's prior SSI application. His analysis adopted Dr. Jensen's consulting examination as its findings and, applying SSA regulations as a framework for his conclusions, he found Plaintiff moderately limited in ADLs, social functioning, and concentration, persistence and pace. No episodes of decompensation for extended periods were indicated.

Plaintiff visited his primary care providers at Mercy Comprehensive Care Center ("MCCC") throughout 2012 for treatment related to his depression. On August 8, 2012, James Raber, N.P. prescribed Symbyax to manage Plaintiff's symptoms. On December 5, 2012, Plaintiff had an appointment at MCCC with Shahid Banclay, M.D. who ordered a refill of Plaintiff's Symbyax prescription and noted that Plaintiff had received numerous referrals for psychiatric care but had offered "lame excuses[.]" (AR at 285.) On January 11, 2013, Plaintiff saw Rani Hanna, M.D. at MCCC for a medication renewal. He reported inability to sleep, tiredness during the day, and feeling "[miserable.]" (AR at 281.) Dr. Hanna recorded Plaintiff's anxiety, refilled Plaintiff's Symbyax prescription, and prescribed a course of Ambien to address Plaintiff's insomnia.

Beginning in the spring of 2013, Plaintiff sought treatment at Spectrum Human Services ("SHS") for post-traumatic stress disorder ("PTSD"), obsessive compulsive disorder ("OCD"), nicotine and cocaine abuse, major depressive disorder, and attention deficient hyperactivity disorder ("ADHD"). On March 25, 2013, Maureen Hirschfelt, a licensed clinical social worker, completed an initial assessment of Plaintiff's mental health and an "adult risk evaluation." (AR at 390.) Plaintiff presented as "somewhat weepy" and was "shaky, hot, [and] overheated." (AR at 386.) He explained that he would not watch movies with his wife because he did not "feel 'safe' out in the living room[.]" Id. Plaintiff reported struggling with anger, irritability, and interaction with others, and stated that he had not worked in eight years due to his mental health.

Ms. Hirschfelt recorded Plaintiff's "passive death wishes[,]" but noted that he did not have active suicidal ideation and instead wished "something would happen that would take his own life." *Id.* She also noted that Plaintiff washed his hands "realistically from 25-50 times per day" and "change[d] [his] socks at least 15 times per day[.]" *Id.* Ms. Hirschfelt observed "some paranoia but no actual delusions." *Id.* Her adult risk evaluation noted Plaintiff suffered from high degrees of unrelenting depression, anxiety, hopelessness, despair, and traumatic stress. She also recorded Plaintiff's occasional tendency to distort criticism as rejection. Ms. Hirschfelt indicated that Plaintiff had few supports for his mental health and a history of abuse during his childhood. She opined that Plaintiff "most likely" suffered from major depressive disorder and anxiety, "probab[ly]" had PTSD and OCD, and noted that Plaintiff had more than one Axis I diagnosis. (AR at 391.) She assessed his risk for suicide as four out of ten.

On March 27, 2013, Plaintiff saw Gerald Frisicaro, N.P. at SHS for further evaluation. Nurse Frisicaro noted that Plaintiff's primary care doctor was treating him with Symbyax and Ambien while urging him to seek additional care at a mental health clinic. Plaintiff described increased depression for the prior six to nine months, with symptoms of anhedonia, passive suicidal ideations, feelings of hopelessness, poor self-esteem, and hyperphagia (excessive appetite). Nurse Frisicaro also recorded Plaintiff's history of anxiety, including emergency room admissions for panic attacks and chronic sleep disturbances with nightmares. Nurse Frisicaro observed that Plaintiff's prior traumatic experiences, primarily at the hand of a physically abusive step-father, led to long-term and "fairly severe hypervigilance, hyperarousal, avoidance symptoms." (AR at 397.) Plaintiff's prior employment often lasted only "a couple of days secondary to his uncomfortableness around others." *Id.*

Nurse Frisicaro also documented Plaintiff's self-report of prior mental health treatment history, including counseling at age seven for behavioral problems and prior treatment at SHS for anger management and lack of focus. Plaintiff indicated that he lived in a group home from ages thirteen to sixteen. Plaintiff's primary care doctor prescribed a series of medications for his mental health, including Prozac, Lamictal,

Paxil, and others whose names Plaintiff could not recall. Nurse Frisicaro made note of Plaintiff's diagnosed learning disabilities, including dyscalculia, dyslexia, and dysgraphia, as well as a history of marijuana and cocaine base abuse.

Nurse Frisicaro's examination revealed Plaintiff's depressed mood, tense affect within normal limits, and "shifting about in [his] seat [with] bouncing of [his] leg." (AR at 398.) Plaintiff's thought process was clear and goal directed, "but with much distractibility, attentional deficits, [and] hypervigilance." *Id.* Nurse Frisicaro found that Plaintiff's judgment and insight were fair, but that he had poor impulse control, was quickly and easily frustrated, and continued to engage in compulsive behavior such as excessive hand washing and sock changing. He diagnosed Plaintiff with recurrent major depression, PTSD, OCD, combined type ADHD, social anxiety disorder, nicotine dependence, and polysubstance abuse in remission. Nurse Frisicaro prescribed a daily regimen of twenty milligrams of Prozac, five milligrams of olanzapine, ten milligrams of Ambien, one milligram of prazosin, and one hundred fifty milligrams of Wellbutrin.

On April 25, 2013, Plaintiff met with Nurse Frisicaro for a follow-up appointment. At this meeting, Plaintiff reported no change in his depression or anxiety. He appeared anxious and depressed with a tense affect. Nurse Frisicaro described Plaintiff's thought process as "comprehensionive" and noted "attentional struggles." (AR at 400.) He renewed Plaintiff's prescriptions and increased his olanzapine dosage to five milligrams in the morning and ten milligrams at night. He changed Plaintiff's prescription from Wellbutrin to ten milligrams of Lexapro.

Plaintiff cancelled or failed to attend scheduled therapy appointments at SHS in the spring of 2013 before attending several throughout the fall of 2013 and 2014. A September 3, 2013 therapy note indicates that Plaintiff had "made progress discussing his thought processes" and could identify some coping skills he had developed to "address his thought/emotion connection." (AR at 435.) Similarly, November 4, 2013 and January 21, 2014 therapy notes reflect that Plaintiff "continue[d] to make progress." *Id.*

In addition to therapy sessions at SHS, Plaintiff continued to see Nurse Frisicaro for psychiatric and pharmacological treatment throughout 2013 and 2014. On November

6, 2013, Plaintiff reported continued irritability and stated that he retreated to his room when others visited his home. Nurse Frisicaro was unable to obtain blood work because of Plaintiff's "ongoing panic attacks and phobia of needles." (AR at 441.) Plaintiff was "bouncing off his feet" during the appointment and displayed "hyperness throughout the session as well as low level panic symptoms of diaphoresis[ and] nervousness." *Id.* Nurse Frisicaro increased Plaintiff's Symbyax dosage and prescribed a generic form of Ritalin to address hyperactivity.

Plaintiff visited Nurse Frisicaro again on December 26, 2013, and reported that he had "been doing fairly well." (AR at 440.) He indicated that Ritalin made him feel more relaxed but occasionally more irritable. Nurse Frisicaro observed that Plaintiff had "poor overall insight into his wide range of symptoms and thus ha[d] difficulties [in] assess[ing] what emotion/struggles [were] due to what." *Id.* He noted that Plaintiff was changing therapists and encouraged Plaintiff to "re-engage with therapy[.]" *Id.* Nurse Frisicaro noted that Plaintiff appeared with euthymic mood and full and appropriate affect but that he had a lower than average ability to modulate his symptoms. He reduced Plaintiff to thirty one milligrams of Symbyax and ten milligrams of Ambien, and noted that Plaintiff would be a "better candidate" for other medication options after more therapy. *Id.*

On March 26, 2014, Plaintiff saw Nurse Frisicaro and reported that his agitation had increased significantly over the prior "couple of weeks." (AR at 434.) He related that he was only sleeping between four and five hours per night and described ongoing social anxiety which confined him to his home. He presented with an anxious mood and pressured affect while demonstrating low frustration tolerance and irritability. Plaintiff's medications were increased and Nurse Frisicaro started a gabapentin program consisting of four hundred milligrams every day for four days, then four hundred milligrams twice a day for the next four days, finally reaching four hundred milligrams three times per day.

On April 11, 2014, Plaintiff was discharged from SMS's care due to conflicts with therapy staff. Plaintiff informed his counselor that he thought she "was a nice person but [that] he ha[d] to go with what he is feeling." (AR at 424) (capitalization omitted). SMS's discharge record noted that Plaintiff "was not able to work on counseling due to

his lack of attendance." (AR at 422) (capitalization omitted). At the time of discharge, SMS offered Plaintiff assistance locating alternative counseling services which he declined.

On April 7, 2014, Plaintiff saw Nirisha Kalakada, M.D. and Baba Ridhwan, M.B.B.S. at MCCC for a follow-up appointment. At this visit, he reported "[f]eeling down, depressed, or hopeless [n]early every day[.]" (AR at 497). Dr. Ridhwan observed Plaintiff's flat affect and performed a PHQ-9 depression screening examination, which yielded a result of "[m]oderately severe depression." *Id.* He diagnosed Plaintiff with depression and anxiety and prescribed a course of Venlafaxine. At a return appointment on August 11, 2014, Dr. Ridhwan repeated the PHQ-9 screening examination which produced the result of "[s]evere [d]epression." (AR at 494.) Plaintiff acknowledged on this occasion that he was no longer attending therapy following a disagreement with his therapist and stated that he had not taken medication for his psychological symptoms in approximately two months. Dr. Ridhwan again diagnosed depression and anxiety and refilled Plaintiff's prescription for Venlafaxine.

According to a Medical Source Statement ("MSS") submitted on June 1, 2015 in connection with Plaintiff's current application for SSI benefits, he began treatment at Mid Erie Counseling on March 20, 2015. A May 28, 2015 diagnostic review indicated Axis I diagnoses of a mood disorder not otherwise specified in the Diagnostic and Statistical Manual ("DSM") and an anxiety disorder which was also not specified in the DSM. Michael Finnegan, a licensed mental health counselor, stated in the June 2015 MSS that Plaintiff was prescribed Klonopin and Ambien after complaining of irritability, problems with social interaction, and symptoms which interfered with his ability to focus and concentrate. These symptoms included feelings of guilt or worthlessness, anxiety, difficulty thinking and concentrating, psychomotor agitation or retardation, apprehensive expectations, recurrent obsessions or compulsions, emotional withdrawal or isolation, hyperactivity, flights of ideas, easy distractibility, and recurrent severe panic attacks. Mr. Finnegan opined that Plaintiff's symptoms resulted in marked impairment of Plaintiff's concentration, persistence, or pace, and his ability to maintain social functioning. He

further predicted that Plaintiff's impairments would result in more than four work absences per month.

**B.    Plaintiff's Function Reports.**

On or about May 15, 2013, Plaintiff completed a function report in which he reported that he lives with his wife in an apartment in Buffalo, New York. He takes care of family pets with assistance from others, and has no difficulty dressing, bathing, shaving, feeding himself, or using the toilet. Plaintiff prepares his own meals daily and did not note any restrictions in his ability to do so, recording that he prepares "whatever [he] feel[s] like[.]" (AR at 185.) He, however, needs reminders to take his medication and perform daily chores.

Socially, Plaintiff experienced limited functioning, indicating that he does not "like [to be] around [a] lot of people[,]" (AR at 186), does not have any hobbies or interests, and that his social interactions are limited to short visits with family which result in him retreating to his room after "a little bit of them being over." (AR at 188.) Plaintiff noted that he has trouble getting along with others, including his family, but does not understand the reasons for this difficulty. He does not often leave his home and confines his method of transportation to a vehicle. He shops for groceries once a month but does so as quickly as possible "to get out of [the] store." (AR at 187.)

Plaintiff also described functional limitations including difficulty paying attention and an inability to finish things he has started. Plaintiff stated that "litt[le] things bother me." (AR at 191.) He confirmed that he has lost employment due to difficulty "getting along with people[.]" (AR at 190.)

**C.    State Consultants' Assessments.**

On or about July 10, 2013, Kevin Duffy, Psy.D. performed a psychological consultative examination of Plaintiff in Buffalo, New York. Plaintiff informed Dr. Duffy that he had been seeing a psychiatrist and counselor every two weeks at SHS for the six months prior to the examination. He reported depressive symptoms including difficulty sleeping, psychomotor retardation, feelings of hopelessness and worthlessness, loss of usual interest, irritability, fatigue and loss of energy, diminished self-esteem, difficulty

concentrating, a diminished sense of pleasure, and some social withdrawal. He also conveyed symptoms of anxiety, including excessive apprehension and worry, hyperstartle response, muscle tension, and hypervigilance. He denied feeling panic or having disordered thoughts, but emphasized his inability to concentrate effectively. Plaintiff admitted to continued use of cocaine and marijuana.

During the examination, Plaintiff was "somewhat irritable and related rather poorly with the examiner." (AR at 334.) He had good personal hygiene and grooming, normal posture and motor behavior, and appropriate eye contact. His speech was fluent and clear, and his expressive and receptive language were adequate. Dr. Duffy found Plaintiff's thought processes "generally coherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the evaluation setting." (AR at 335.) Plaintiff had a "somewhat depressed" affect and appeared irritated and apathetic at times with a dysthymic mood. With regard to attention and concentration, Dr. Duffy indicated that Plaintiff's capabilities "appeared to be grossly intact." *Id.* He was able to count, as well as perform simple calculations and the serial three task. Plaintiff's recent and remote memory was deemed to be grossly intact. Dr. Duffy observed that he "believed" Plaintiff's cognitive functioning was "somewhat below average" but that his general fund of information was appropriate for his experience. *Id.* Dr. Duffy evaluated Plaintiff's insight and judgment as "fair to poor[.]" *Id.* After noting that Plaintiff is capable of performing ADLs independently, Dr. Duffy diagnosed Plaintiff with mild major depressive disorder without psychotic features as well as substance abuse and opined that Plaintiff's prognosis was "just fair at this time." (AR at 337.)

On or about August 8, 2013, state agency consultant Cheryl Butensky, M.D. reviewed Plaintiff's medical record and Dr. Duffy's consulting opinion and then performed a PRT in connection with Plaintiff's current SSI application, wherein she concluded that "the evidence indicates that [Plaintiff] has a C[ognitive ]D[ysfunction] impairment with mild to moderate comorbid psychiatric impairment for which he has not been in ongoing m[ental ]h[ealth] treatment that would improve function. [Plaintiff] appears capable of simple work with superficial contact with the public, co-workers, and

supervisors." (AR at 97) (capitalization omitted). Based on this assessment, Dr. Butensky opined that Plaintiff was not significantly limited in his ability to remember locations and work-like procedures or ability to understand and remember very short and simple instructions. She found Plaintiff moderately limited in his ability to understand and remember detailed instructions.

With regard to Plaintiff's ability to concentrate and persist, Dr. Butensky concluded that Plaintiff was not significantly limited in his ability to follow very short and simple instructions, sustain an ordinary routine without supervision, or make simple work-related decisions. In contrast, he was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, work in coordination with or in proximity to others without distraction, complete a normal workday and workweek without interruptions from psychologically based symptoms, or perform at a consistent pace without an unreasonable number and length of rest periods.

Dr. Butensky further concluded that Plaintiff was moderately limited in his ability to interact appropriately with the general public, accept instruction, and respond appropriately to criticism from superiors. She further found Plaintiff moderately limited in his ability to respond appropriately to changes in the work setting, notice ordinary normal hazards and take appropriate precautions, and to set realistic goals or make plans independently of others.

### D. Testimony at the ALJ Hearing.

At the June 22, 2015 hearing before ALJ Cordovani, Plaintiff testified that he lived with his wife in the lower unit of a two story duplex apartment. He stated that he previously assisted with snow removal and lawn maintenance obligations attendant to their lease, but he no longer did so following a motor vehicle accident which resulted in a herniated disc in his cervical spine.

Plaintiff last worked in 2009 as a cook for six months, which employment ended due to a "conflict with the people" where he "flipped out[.]" (AR at 45-46.) Plaintiff described his departure as "mutual[.]" (AR at 46.) This position was the longest tenured

job in Plaintiff's employment history. After leaving his position as a cook, Plaintiff received unemployment benefits while he searched for new employment in "general labor[.]" (AR at 48.) His job search was ultimately unsuccessful, and Plaintiff had not obtained gainful employment from his last day of work in 2009 until the date of the hearing.

Plaintiff confirmed that he was able to perform most ADLs, including bathing and dressing himself. He testified that he occasionally completed projects around his apartment, such as painting a windowsill. He also assisted his wife with dishes and other activities such as vacuuming, laundry, and simple meal preparation in a microwave.

With regards to social interaction, Plaintiff testified that he generally stayed at home alone in his room, except for occasional social gatherings with "a few friends." (AR at 67.) He explained that he did not "like being around people. [He would] rather be off on [his] own." (AR at 56.) He drove every day, most often to a drive-through restaurant but occasionally to grocery or home goods stores. He also drove to doctor's appointments and a pharmacy. When he did leave his home to perform these tasks, he preferred to complete them as quickly as possible to minimize his contact with others. He explained that "[i]f I'm not around people, I – nobody can hate me." *Id.*

Plaintiff testified that he had seen multiple mental health counselors throughout his life and that he had left SHS because of a poor relationship with his counselor there. He stated that he saw other counselors between the end of his treatment at SHS in 2014 and the beginning of his treatment at Mid-Erie in 2015, but could not remember their names. He explained that he was seeing a counselor at the time of the hearing with whom he had a good relationship and saw approximately three times per month. Plaintiff admitted that he occasionally missed appointments because he did not "want to leave [his] room[.]" (AR at 52.) He further testified that he sees a psychiatrist monthly. Plaintiff explained that he sought his most recent mental healthcare at the urging of his primary care physician, who identified Plaintiff's obsessive tendencies to wash his hands and change his socks as requiring specialized care.

With respect to his mental health symptoms, Plaintiff reported that his ability to concentrate was variable and "depend[ed] on the day." (AR at 57.) He could sometimes follow an entire television show, but other times could not, depending on the content of the program. Plaintiff testified that he became irritable and angry when under stress, and that he experienced anxiety attacks approximately ten times per day on average, lasting for between two minutes and three hours. During those attacks, Plaintiff would become sweaty, shaky, and have clammy hands. The attacks had no set duration and Plaintiff explained that his only way of managing them was to "take [his] meds and hope for the best." (AR at 59.) He also stated that he "avoid[s] a lot of things" due to his PTSD. *Id.* Plaintiff described difficulty sleeping, stating that "probably six [hours] would be a great night's sleep; four hours is what [he sleeps] at night, and it's broken." (AR at 73.) Plaintiff testified that his prescriptions for Klonopin and Ambien were somewhat helpful but failed to completely control his psychological symptoms. He further testified that he felt he would "be better off dead" but denied "thoughts of hurting [himself.]" (AR at 64.)

Following Plaintiff's testimony, VE Pearson testified that Plaintiff's prior work experience matched two occupations in the Dictionary of Occupational Titles ("DOT"): short-order cook and material handler. VE Pearson further testified that the role of short-order cook is generally performed at the "light exertional level" and the material handler position is performed at "the heavy level of exertion." (AR at 78, 80.)

The ALJ then asked VE Pearson to consider a hypothetical individual capable of light work as defined in the SSA regulations but with additional vision and postural limitations. The ALJ's hypothetical also limited the individual's mental abilities to understanding, remembering, and carrying out simple instructions and tasks without supervisory duties or independent decision making, as well as tolerating only minimal changes in work routine and processes. Finally, the ALJ limited the hypothetical individual to no more than occasional interaction with supervisors and incidental interaction with coworkers and the general public.

VE Pearson opined that such an individual would not be capable of performing any of Plaintiff's past work. However, an individual with the hypothetical limitations

14

would be capable of performing the representative duties of a photocopy machine operator, a router, or a marker. In response to a question from the ALJ, VE Pearson further opined that a hypothetical individual with the stated functional capabilities but limited by an inability to maintain concentration, focus, and pace for at least two hours at a time would be unable to perform any of the representative occupations. In response to another question from the ALJ, the VE testified that employers in the national economy for the three representative occupations would not tolerate four employee absences per month.

## III. ALJ Cordovani's Application of the Five-Step, Sequential Evaluation Framework.

In order to receive SSI benefits, a claimant must be disabled at some point prior to the termination of his or her application. A SSI application remains "in effect" for purposes of determining the claimant's eligibility for benefits until a hearing decision on the application is issued. 20 C.F.R. § 416.330. Consequently, in order to qualify for SSI benefits, Plaintiff must have been disabled at some point prior to the ALJ's August 19, 2015 decision.

SSA regulations set forth the following five-step, sequential evaluation framework to determine whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)). "The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at [S]teps [O]ne through [F]our of the sequential five-step framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128

(2d Cir. 2008) (internal quotation marks and citation omitted). At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *McIntyre*, 758 F.3d at 150 (alterations in original) (internal quotation marks omitted).

In this case, ALJ Cordovani concluded that Plaintiff did not engage in substantial gainful activity at any time after he filed his application. At Step Two, the ALJ determined that Plaintiff suffers from the following severe impairments: spondylosis and stenosis of the cervical spine, lumbar strain, asthma, loss of visual efficiency in the right eye, mood disorder, anxiety disorder, and OCD.

At Step Three, ALJ Cordovani determined that none of Plaintiff's severe impairments met or medically equaled the severity of any Listed Impairment at 20 C.F.R. Part 404, Subpart P, Appendix 1. In making this determination, the ALJ considered Plaintiff's impairments in isolation and combination, specifically finding that the criteria for Listings 1.04, 2.04, 3.03, 12.04, and 12.06 were not met. With respect to Plaintiff's mental impairments, the ALJ considered whether the "paragraph b" or "paragraph c" criteria for Listings 12.04 and 12.06 were satisfied and determined that they were not. ALJ Cordovani afforded Dr. Butensky's opinion great weight in evaluating the severity of Plaintiff's mental impairments in relation to the Listings' requirements.

At Step Four, the ALJ determined that Plaintiff possessed the physical RFC to perform light work as defined at 20 C.F.R. § 416.967(b) with some additional limitations stemming from his spinal, visual, and asthmatic impairments. With regard to Plaintiff's mental RFC, ALJ Cordovani found that Plaintiff:

> [can] work in a low stress work environment, defined as being able to understand, remember, and carry out simple instructions and tasks, no supervisory duties, no independent decision-making, no strict production quotas and only minimal changes in work routine and processes. He could have occasional interaction with supervisors and no or only incidental interaction with co-workers and the general public.

(AR at 13.)

In determining Plaintiff's mental RFC, ALJ Cordovani concluded that Plaintiff's "reported activities and his actions in seeking or receiving treatment are inconsistent with

having disabling impairments." (AR at 14.) He noted Plaintiff's gap in treatment between his April 2014 discharge from SHS and the beginning of his treatment at Mid-Erie in May 2015, and observed that "the evidence reflects that the claimant sought limited treatment for his mental impairments." (AR at 16.) ALJ Cordovani also noted that Dr. Duffy's consulting examination found Plaintiff's attention and concentration grossly intact, as well as his recent and remote memory. He did account for Plaintiff's variable ability to focus and acknowledged that Plaintiff had difficulty interacting with others.

In evaluating the opinion evidence related to Plaintiff's mental impairments, the ALJ gave "great weight" to Dr. Butensky's opinion that Plaintiff was "capable of simple work with superficial contact with the public, co-workers, and supervisors" and found this opinion consistent with the medical record. *Id.* ALJ Cordovani afforded Dr. Jensen's and Dr. Mangold's opinions little weight because they were made more than a year before Plaintiff's alleged onset date. ALJ Cordovani concluded that Dr. Duffy's consultative examination and assessment "under-evaluated the severity of [Plaintiff's] limitations," noting that Plaintiff's level of concentration varies and his ability to tolerate exposure to other people is more limited than Dr. Duffy opined. He therefore afforded Dr. Duffy's opinion "only partial weight." (AR at 17.) Finally, the ALJ afforded little weight to Mr. Finnegan's 2015 MSS because he "is not an acceptable medical source" under 20 C.F.R. § 416.913(a), lacks a "thorough knowledge of [the] Social Security Administration's rules and regulations[,]" and had a short treatment relationship with Plaintiff. (AR at 18.) The ALJ concluded that Mr. Finnegan's lack of a "significant longitudinal view of [Plaintiff's] mental functioning" rendered his opinion of little value. *Id.*

After determining Plaintiff's RFC, ALJ Cordovani found that Plaintiff had no past relevant work within the meaning of the SSA regulations based on his earning history. He therefore went on to consider whether Plaintiff was capable of transitioning to work existing in significant numbers in the national economy. Based on VE Pearson's testimony, he concluded that Plaintiff is capable of adjusting to the representative

17

occupations of photocopy machine operator, router, or marker. He therefore found Plaintiff not disabled at any time from his alleged onset date to the date of the ALJ's decision.

## IV. Conclusions of Law and Analysis.

### A. Standard of Review.

In reviewing the Commissioner's decision, the court "'conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied.'" *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Even if the court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision when it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g). It is the Commissioner that resolves evidentiary conflicts and determines credibility issues, and the court may not substitute its own judgment for that of the Commissioner. *See Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984).

### B. Whether the ALJ Erred by "Cherry Picking" a State Agency Consultant's Opinion Without Explanation or Justification.

Plaintiff argues that the ALJ improperly adopted some of Dr. Butensky's findings while excluding others without explanation in the process of formulating the non-exertional mental limitations in Plaintiff's RFC. He contends that "[t]he ALJ may not 'cherry pick' evidence in support of his contention that the record does not warrant a finding of disability, relying on a technique of selecting facts that tend against a finding of disability while ignoring those that are consistent with a finding of disability." (Doc. 8-1 at 18.)

Specifically, Plaintiff maintains that the ALJ did not incorporate Dr. Butensky's opinion that he is moderately limited in his ability to maintain concentration, persistence, or pace and in his ability to maintain attention and concentration for extended periods, or her opinion that he has moderate limitations in his ability to perform activities within a schedule. Most importantly, Dr. Butensky opined that he is moderately limited in his ability to maintain regular attendance, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. None of these restrictions were included in the ALJ's RFC. As Plaintiff points out, VE Pearson opined that a hypothetical individual with Plaintiff's RFC who, in addition, could not concentrate and work on pace for two hours at time or would have four absences a month would be unable to work in any job existing in significant numbers in the national economy.

While an ALJ need not discuss every aspect of an opinion on which he or she relies, an ALJ may not freely select only those portions of a medical assessment he or she deems valuable and discard the rest without explanation.[4] The obligation to explain why certain elements of an opinion were not adopted is triggered when "the RFC assessment conflicts with an opinion from a medical source[.]" SSR 96-8p, 1996 WL 374184, at *7 (Jul. 2, 1996).

The Commissioner contends that the omitted non-exertional limitations from Dr. Butensky's assessment are "not inconsistent with the doctor's overall opinion in the PRT explanation that Plaintiff can perform simple work with superficial contact with the

---

[4] *See Shaw v. Chater*, 221 F.3d 126, 135 (2d Cir. 2000) (observing that the ALJ's rejection of a medical opinion "when it supported a finding that plaintiff was disabled" but adoption of it when concluding that he was not disabled constituted "inconsistent use of the medical evidence" which "undermine[d]" the ALJ's conclusion that the physician was unreliable); *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) (concluding that claimant was "entitled to an express recognition" of a physician's subsequent report favorable to a disability determination where the Appeals Council acknowledged the same physician's prior report); *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983) ("we cannot accept an unreasoned rejection of all the medical evidence in a claimant's favor"); *see also Gecevic v. Sec'y of Health & Human Servs.*, 882 F. Supp. 278, 286 (E.D.N.Y. 1995) (holding that an ALJ "cannot simply selectively choose evidence in the record that supports his conclusions") (citing *Fiorello*, 725 F.2d at 176).

public, coworkers, and supervisors." (Doc. 9-1 at 26.) This opinion, however, was tempered by further restrictions on Plaintiff's ability to actively sustain a normal work schedule. It was thus error for ALJ Cordovani to fail to explain why only certain aspects of Dr. Butensky's opinion were entitled to "great weight[,]" without addressing the remainder. *See Snell*, 177 F.3d at 134 ("The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even—and perhaps especially— when those dispositions are unfavorable.").[5]

The ALJ's failure to adequately account for all of the limitations contained in Dr. Butensky's opinion, or to justify selective incorporation of Dr. Butensky's findings in his written decision was not harmless.[6] Courts of Appeals have applied two distinct tests when determining whether an ALJ's error is harmless in an SSA case. The first view holds that "'[s]o long as there remains substantial evidence supporting the ALJ's conclusions . . . and the error does not negate the validity of the ALJ's ultimate . . .

---

[5] As Plaintiff points out, courts have held that an RFC limited to simple, routine tasks is not the equivalent of a consideration of concentration, persistence, or pace. *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011) ("Other circuits have also rejected the argument that an ALJ generally accounts for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work."); *Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009) ("The Commissioner continues to defend the ALJ's attempt to account for mental impairments by restricting the hypothetical to 'simple' tasks, and we and our sister courts continue to reject the Commissioner's position"); *see also Hudson v. Comm'r of Soc. Sec.*, 2011 WL 5983342, at *9 (D. Vt. Nov. 2, 2011) ("restricting the hypothetical to routine and repetitive tasks with brief and superficial contact with the general public, coworkers, and supervisors does not accurately describe a claimant's documented limitations in concentration, persistence, or pace") (internal quotation marks and citation omitted).

[6] The Second Circuit has held that, in some circumstances, certain errors may be harmless.

> [A]n ALJ's failure to incorporate non-exertional limitations in a hypothetical (that is otherwise supported by evidence in the record) is harmless error if (1) "medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace," and the challenged hypothetical is limited "to include only unskilled work"; or (2) the hypothetical "otherwise implicitly account[ed] for a claimant's limitations in concentration, persistence, and pace[.]"

*McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014). Here, however, the ALJ included an incomplete description of Plaintiff's mental functional limitations in his RFC. *may have* ^

20

public, coworkers, and supervisors." (Doc. 9-1 at 26.) This opinion, however, was tempered by further restrictions on Plaintiff's ability to actively sustain a normal work schedule. It was thus error for ALJ Cordovani to fail to explain why only certain aspects of Dr. Butensky's opinion were entitled to "great weight[,]" without addressing the remainder. *See Snell*, 177 F.3d at 134 ("The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even—and perhaps especially—when those dispositions are unfavorable.").[5]

The ALJ's failure to adequately account for all of the limitations contained in Dr. Butensky's opinion, or to justify selective incorporation of Dr. Butensky's findings in his written decision was not harmless.[6] Courts of Appeals have applied two distinct tests when determining whether an ALJ's error is harmless in an SSA case. The first view holds that "'[s]o long as there remains substantial evidence supporting the ALJ's conclusions . . . and the error does not negate the validity of the ALJ's ultimate . . .

---

[5] As Plaintiff points out, courts have held that an RFC limited to simple, routine tasks is not the equivalent of a consideration of concentration, persistence, or pace. *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011) ("Other circuits have also rejected the argument that an ALJ generally accounts for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work."); *Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009) ("The Commissioner continues to defend the ALJ's attempt to account for mental impairments by restricting the hypothetical to 'simple' tasks, and we and our sister courts continue to reject the Commissioner's position"); *see also Hudson v. Comm'r of Soc. Sec.*, 2011 WL 5983342, at *9 (D. Vt. Nov. 2, 2011) ("restricting the hypothetical to routine and repetitive tasks with brief and superficial contact with the general public, coworkers, and supervisors does not accurately describe a claimant's documented limitations in concentration, persistence, or pace") (internal quotation marks and citation omitted).

[6] The Second Circuit has held that, in some circumstances, certain errors may be harmless.

> [A]n ALJ's failure to incorporate non-exertional limitations in a hypothetical (that is otherwise supported by evidence in the record) is harmless error if (1) "medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace," and the challenged hypothetical is limited "to include only unskilled work"; or (2) the hypothetical "otherwise implicitly account[ed] for a claimant's limitations in concentration, persistence, and pace[.]"

*McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014). Here, however, the ALJ may have included an incomplete description of Plaintiff's mental functional limitations in his RFC.

conclusion, such [an error] is deemed harmless and does not warrant reversal.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) (quoting *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1162 (9th Cir. 2008)). This standard has been described as permitting errors "that are inconsequential to the ultimate nondisability determination." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (internal quotation marks omitted).

The second approach takes a narrower view of the range of permissible errors and maintains instead that "[a]n ALJ's error is harmless if, in light of the record-supported reasons supporting the adverse . . . finding, we can conclude that the ALJ's error did not 'affect[] the ALJ's conclusion.'" *Carmickle*, 533 F.3d at 1168 (Graber, J., dissenting) (quoting *Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1197 (9th Cir. 2004)). A court applying the second test must reverse the Commissioner's decision if, in light of the record as a whole, it is unable to determine whether the ALJ's error affected his or her ultimate disability determination.

The Second Circuit has not squarely addressed which formulation of the harmless error test applies to SSA claimants. This court need not resolve that issue, because on either theory, "under the facts and circumstances of this case, the failure to incorporate moderate psychological limitations found by [a consulting examiner whose opinion was afforded great weight] into the RFC warrants remand." *Altman v. Berryhill*, 2017 WL 5634731, at *6 (W.D.N.Y Nov. 7, 2017). On the present record, the court cannot determine whether the ALJ considered the omitted limitations from Dr. Butensky's report and to what extent those considerations might modify Plaintiff's mental RFC. Remand is therefore appropriate so that the ALJ may consider all of the limitations noted in Dr. Butensky's consulting assessment and make any corresponding adjustments to Plaintiff's mental RFC.

## CONCLUSION

For the foregoing reasons, the court GRANTS Plaintiff's motion for judgment on the pleadings (Doc. 8) and DENIES the Commissioner's cross-motion for the same (Doc. 9). The case is REMANDED to the Social Security Administration for further proceedings consistent with this opinion.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _11th_ day of May, 2018.

Christina Reiss, District Judge
United States District Court